People v Liu (2024 NY Slip Op 50954(U))

[*1]

People v Liu

2024 NY Slip Op 50954(U)

Decided on July 19, 2024

Criminal Court Of The City Of New York, Queens County

Pappachan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 19, 2024
Criminal Court of the City of New York, Queens County

The People of the State of New York

against
Steven Liu, Defendant.

Docket No. CR-008494-23QN

For the People:
Timothy Matthews, Criminal Law Associate
ADA Diana Costin
Queens County District Attorney's Office
For the Defendant:
Laura Eraso, Of Counsel 
Kenneth Finkelman, Of Counsel
The Legal Aid Society

Vidya Pappachan, J.

The Defendant, Steven Liu, stands charged with violations of VTL §§ 1192.3, 1192.1, 1212, and PL §§ 220.03, 120.20 and 270.25. A combined Huntley/Mapp/Dunaway/Refusal hearing was conducted by this Court. The People presented the testimony of Police Officer (PO) Ioannis Kalogeras and introduced the IDTU video and Interrogation Warnings into evidence. The defense did not call any witnesses but introduced the Body-Worn Camera (BWC) footage of Officer Kalogeras. The Court has considered the oral arguments of both parties as well as the respective submissions of case law.
Here, the People contend that the stop of the vehicle alleged to have been operated by the Defendant and Defendant's subsequent arrest were lawful. The People seek to introduce certain statements alleged to have been made by the Defendant, physical evidence recovered, namely two vials of ketamine, as well as evidence of the Defendant's alleged refusal to take a breathalyzer test.
The Court credits the testimony of PO Ioannis Kalogeras and now makes the following finding of fact.
Findings of Fact
Officer Ioannis Kalogeras has been employed as an officer with the NYPD's 110th precinct for the last two and a half years and is currently a patrol officer. He received training within the NYPD Academy on recognizing signs of identifying intoxicated individuals including body language, slurred speech, unsteady movements and drowsy, watery eyes. PO Kalogeras testified that as a police officer, he frequently encountered intoxicated individuals exhibiting [*2]these symptoms that involved intoxicated drivers, homeless individuals, and disruptive individuals. Over the course of his career, he's conducted approximately 45 arrests, about 3 of which involved intoxicated drivers.
On March 26, 2023, PO Kalogeras was working a day tour between the hours of 7:05 to 15:45, conducting patrol in a marked police vehicle. At approximately 9:30 am, PO Kalogeras and his partner were flagged down by an individual in the area of College Point Boulevard, Queens. PO Kalogeras did not recall the exact location where he was flagged down but indicated that it was in the confines of the 109th Precinct and that they had been flagged down on their way to get fuel for their patrol vehicle. The individual indicated that there was a vehicle at the intersection, right under the traffic light that had been stopped for "a bit" (Hearing Tr, April 4, 2024, p12). PO Kalogeras and his partner approached the vehicle, a black SUV Volkswagen, and saw that there was an individual seated in the driver's seat. PO Kalogeras identified the Defendant, Mr. Liu, in Court as the individual he observed that day in the driver's seat of the black Volkswagen.
Upon his approach of the vehicle, he noticed through the windows that the engine was running, but the Defendant was slouched over, and his eyes were closed. PO Kalogeras knocked on the window and asked the Defendant to roll down the window. Instead, the Defendant started to slowly drive the vehicle at approximately 5-10 miles per hour and as he did, made a left, and then a sharp right and ended up on the sidewalk where there were several individuals at the corner of the block. PO Kalogeras testified that when the Defendant drove off, he entered back into his vehicle and was able to cut the Defendant off by a driveway near the entrance of an auto-body mechanic shop in the vicinity of 36-27 College Point Boulevard. He and his partner then removed the Defendant from the vehicle and placed him by the front of the vehicle. PO Kalogeras testified that he noticed the Defendant to have slurred speech, was a little off balance when he tried to stand, and his eyes were "low" (Id p16) and looked drowsy. PO Kalogeras testified that based on these observations he and his partner immediately determined the Defendant was intoxicated and placed the Defendant under arrest. The time of arrest was 10:19 am.
According to PO Kalogeras, shortly after being placed in handcuffs, the Defendant stated to him, "I'm sorry for being an intoxicated driver" (Id p17). During this interaction, the Defendant stated that he wanted to speak to a lawyer. The Defendant was searched at the scene and officers recovered US currency, car keys and two vials of a white substance from the Defendant's person. The substance was later determined to be ketamine. PO Kalogeras and his partner awaited officers from another precinct to arrive. During the 30-minute wait for other officers, the Defendant asked the PO Kalogeras and his partner if he could smoke his vape pen. PO Kalogeras testified that he and his partner initially refused the request, but then ultimately consented because "it would help [the Defendant] relax" (Hearing Tr, April 18, 2024, p29).
Approximately 50 minutes after the Defendant's arrest, once officers from the 109th precinct arrived at the scene, PO Kalogeras transported the Defendant to the 112th precinct for the purpose of administering a chemical breath analysis test. In his presence, the Defendant was asked by an IDTU (Intoxicated Drivers Testing Unit) Officer to submit to a chemical breath analysis test. The Defendant indicated that he would not take the test. The time was 11:00 am. The Defendant was then read refusal warnings which were memorialized on the IDTU video. At the 1:29 timestamp on the video, the Defendant was again asked whether he would submit to a chemical breath test and the Defendant again answered that he would not take the test.
PO Kalogeras then read the Defendant his Miranda rights, from a standard police form and marked the Defendant's answers. The Defendant acknowledged that he understood his Miranda rights. PO Kalogeras then engaged the Defendant in questioning about the incident, again from a standardized form. The Defendant answered some of these questions.
Conclusion of Law
The People bear the initial burden to establish by credible evidence, the lawfulness of police conduct (People v Berrios, 28 NY2d 361, 367-368 [1971]; People v Hernandez, 40 AD3d 777, 778 [2d Dept 2007]). In evaluating police action, the court must determine whether it was justified at its inception and whether it was reasonably related in scope to the circumstances at the time (People v DeBour, 40 NY2d 210, 215 [1976]). An officer has probable cause to arrest an individual for a committing an offense when "[it] appear[s] to be more probable than not that a crime has taken place and the one arrested is its perpetrator, for conduct equally compatible with guilt or innocence will not suffice" (People v Carrasquillo, 54 NY2d 248, 254 [1981]). If the People satisfy their initial burden, the Defendant bears the ultimate burden of proving any illegality of police conduct by a preponderance of the evidence and that, therefore, the evidence should be suppressed (Berrios at 367).
Where, as here, a defendant is charged with a driving while intoxicated related offense, probable cause exists when an officer "can demonstrate reasonable grounds to believe that the defendant had been driving in violation of [VTL] § 1192" (People v Kowalski, 291 AD2d 669, 670 [3d Dept 2002]). Alternatively, "an officer may approach a parked car for an objective, credible reason, not necessarily indicative of criminality" to request information (People v Ocasio, 85 NY2d 982, 984 [1995]; see De Bour, 40 NY2d at 223]). An intrusion under such circumstances must comport with the four-tier analysis articulated in De Bour. De Bour's first level of intrusion permits a law enforcement officer to approach a citizen and request information provided there is an objective, credible, and articulable reason to do so, not necessarily indicative of criminality. The second level, the common-law right of inquiry, permits a momentary stop when there is a "founded suspicion that criminal activity is afoot" (id.). Under the third level, an officer may forcibly stop and detain a person when such officer has a reasonable suspicion that the individual has been involved in criminal activity. Finally, an officer may affect a full-blown arrest when there is probable cause to believe that an individual has, is or is about to commit a crime (id. at 223). In laying out this four-tiered analysis, the Court of Appeals recognized "that police-citizen encounters are dynamic situations during which the degree of belief possessed at the point of inception may blossom by virtue of responses or other matters which authorize and indeed require additional action as the scenario unfolds" (De Bour, 40 NY2d at 225; see People v Hollman, 79 NY2d 181, 191 [1992]).
Here, neither party contests that the officer's initial approach of the defendant in his stopped vehicle required any more than an objective, credible reason to do so. Officer Kalogeras and his partner were flagged down by an individual to attend to a vehicle that been stopped at an intersection for a prolonged time. Upon noticing that that the Defendant was slouched over and appeared to be sleeping, officers were justified in trying to awake the Defendant not only to ensure the Defendant's safety but in conducting any preliminary investigation. The incident was escalated when the Defendant immediately drove away from officers and ultimately drove his vehicle off the roadway where other individuals were present on a sidewalk. Although this was not a chase of the Defendant, based on the circumstances, officers were justified in forcibly [*3]stopping and detaining the Defendant. Officers initially encountered the Defendant slouched over in a stopped vehicle in the middle of a busy intersection and then observed the Defendant as he drove away and veered off the roadway. Based upon PO Kalogeras further observations of the Defendant slouched over in the driver's seat of his vehicle, exhibiting low, drowsy eyes, having slurred speech and swaying off balance, PO Kalogeras and his partner had probable cause to arrest the Defendant for operating a motor vehicle while under the influence of what appeared to be alcohol. Thus, the Defendant's motion to suppress evidence on the ground that PO's lacked probable cause to arrest the Defendant is denied.
Physical Property
Police are permitted to search the "person of an individual that is lawfully arrested, or the area within their immediate control, if the search 'closely follows [the] arrest'" (People v Belton, 55 NY2d 49 [1982]). The authority to lawfully search an individual shortly after their arrest "is grounded in protecting the safety of the arresting officer by permitting him to search for and seize weapons when there is reason to fear for his safety and in preventing the person arrested from destroying evidence of criminal involvement by permitting the arresting officer to search for and seize such evidence" (Id at 52-53). However, a search must be incident to an actual arrest, not just to probable cause that might have led to an arrest, but did not (People v Reid, 24 NY3d 615, 619 [2014]). Here, officers were permitted to search the Defendant's person, following his arrest as a search incident to the lawful arrest of the Defendant. Accordingly, the items recovered from the Defendant which included US currency, keys and two vials of a white substance are admissible as evidence following a lawful search.
Statements
The Defendant is alleged to have made two separate statements: one at the scene contemporaneously with his arrest and another at the 112th precinct. The People bear the burden of proving the voluntariness of each statement made by Defendant to law enforcement beyond a reasonable doubt (People v Huntley, 15 NY2d 72, 78 [1965]). If the People have satisfied their obligation, the burden is on the defendant to show otherwise (People v Vidal, 44 AD3d802, 802 [2nd Dept 2007]). In determining the voluntariness or involuntariness of the Defendant's statements, the Court takes into consideration certain factors. The statements must not be coerced nor obtained by threats, improper conduct, undue pressure, or trickery (Brown v Mississippi, 297 US 278; CPL 60.45[2][a]).
Where statements are not voluntary, Miranda safeguards are triggered whenever there is custodial interrogation. In deciding whether a Defendant is in custody, the Court evaluates whether a reasonable person, innocent of any crime, would have thought he was free to leave had he been in the Defendant's position (People v Harris, 48 NY2d 208, 2015 [1979]; People v Yukl, 25 NY2d 585 [1969]). As to whether a Defendant has been subject to interrogation, the Court evaluates 'words' or 'actions' on the part of the police that are likely to elicit an incriminating response (People v Wortham, 37 NY3d 407, 413 [2021], quoting People v Ferro, 63 NY2d 316 [1984]). The People may not use statements that are the product of custodial interrogation unless it demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination (Miranda v Arizona, 384 US 436,444-45 [1966)].
Here, the Defendant's statements at the scene "I'm sorry for being an intoxicated driver" were spontaneous and the product of any questioning or prompting by officers. While the [*4]statment was made after the Defendant was placed under arrest and clearly in custody, the statement was not elicited as a result of any interrogation by officers. As such, this statement at the scene is admissible as a voluntary statement by the Defendant (People v Watson, 214 AD3d 911 [2d Dept 2023]).
As to the Defendant's statements at the 112th precinct, PO Kalogeras testified that after the Defendant was read Refusal Warnings and did not agree to take a breath test, he read the Defendant Miranda rights from a standardized police form and noted the Defendant's answers acknowledging his rights. The Defendant answered certain questions. While the exact substance of the statements was not elicited at the hearing, the Defendant's statements were recorded on the Interrogation Warnings Form which was admitted into evidence at the hearing (People v Steisi, 257 AD2d 582 [2d Dept 1999]). The statements made by the Defendant at the 112th precinct are admissible as they were made after he was validly read, acknowledged and waived his Miranda rights (see People v Raffaele, 41 AD3d 869 [2d Dept 2007]).
Breathalyzer Test
Where an individual is arrested for an alcohol-related offense and asks to contact an attorney before responding to a request to take a chemical test, "the police 'may not, without justification, prevent access between the accused and his lawyer, available in person or by immediate telephone communication'" (People v Smith, 18 NY3d 544, 549 [2012] quoting People v Gursey, 22 NY2d 224, 227 [1968]). In Smith, the Court elucidated the balancing of due process considerations that are necessary to ensure that an accused's right to counsel is not violated, while also taking into account the mandates set forth in VTL § 1194(2)(b) for the timely administration of a chemical test (Gursey at 229). Thus, "there is no absolute right to refuse to take the test until an attorney is actually consulted, nor can a defendant use a request for legal consultation to significantly postpone testing" (Smith, 18 NY3d at 549).
Here, BWC footage from PO Kalogeras shows the Defendant in custody for more than an hour and a half from before chemical test refusal warnings were read to him at approximately 11:07 a.m. Of that time, Defendant was at the scene in handcuffs for nearly 45 minutes while waiting for officers from another precinct to arrive. Thus, it is clear that Defendant's requests to contact his lawyer were not an attempt to thwart and delay the administration of the chemical test. When the Defendant was finally transported to the 112th precinct, he was read the chemical test refusal warnings by an IDTU officer. While there, the Defendant again requested if he could make a phone call to try and contact someone that could get in touch with his attorney. He was told by the IDTU officer that he had been given an opportunity to make a call, to which Defendant responded that a person would not know how to call back to an unknown number. The IDTU officer then decided to terminate the testing process and deemed the Defendant's responses a refusal to take the chemical breath test. The question before the Court is whether Defendant's insistence to try to contact an attorney and the IDTU officer's decision to terminate testing constitutes an actual refusal to take the chemical test.
The situation at hand is analogous to the factual circumstances before the Court of Appeal in Smith. There, state troopers read the Defendant chemical test warnings three separate times after a series of breaks to allow Defendant to get in touch with an attorney. After the third time the trooper read the warnings and sought an answer from defendant concerning whether he would take a chemical test, Defendant responded that he was still waiting for his attorney to call him back. At that point, troopers interpreted defendant's response as a refusal to submit to the [*5]test. The Smith Court found that because the Defendant was not advised that his responses would be considered a refusal to take the test, he was not "adequately warned" and it was not indeed a refusal under the law (supra at 549). In making its determination, the Smith court pointed to the "comparable admonition" in People v O'Rama, 78 NY2d 270 [1991], where officers specifically advised the Defendant that they would deem the Defendant's insistence to consult with an attorney before taking the chemical test, despite his inability to reach a lawyer, a refusal.
Applying this standard to the factual circumstances presented here, the Defendant's conduct does not rise to a refusal to take the chemical breath test. Indeed, a person's refusal to submit to a chemical test is only admissible against him at trial upon a showing that the person was given sufficient warnings, in clear and unequivocal language, of the effect of such refusal, and following such warnings, the person persisted in the refusal (People v Washington, 23 NY3d 228, 231 [2014]; People v Smith, 18 NY3d 544, 550; People v Williams, 99 AD3d 955, 956; see People v Sirico, 135 AD3d 19, 22 [2d Dept 2015]). "Persistence requires repetitive or unwavering conduct" or "a steadfast position, shown by a continued position despite opposition" (Prince v DMV, 36 Misc 3d 314, 322 [Sup Ct, NY County 2011]).
Here, Defendant was read refusal warnings from what appeared to be a standardized form. When the Defendant asked for another opportunity to make a call to get in touch with his lawyer, the officer told him that he had already been given an opportunity and when Defendant continued to persist in questioning, the officer terminated the testing process altogether and deemed it a refusal. The lack of any further warnings to the Defendant falls short of "clear and unequivocal language" (supra Washington). Moreso, applying this standard to a review of the evidence, Defendant's continued requests to try to contact his attorney does not amount to an unequivocal and persistent refusal to take a chemical test.
Conclusion
The People have sufficiently demonstrated that there was probable cause to arrest the Defendant. Accordingly, the Defendant's motion to suppress all tangible, non-tangible and testimonial evidence as the fruits of an unlawful arrest is denied. 
Defendant's statements at the scene are admissible as they are voluntary statements. The statements made at the 112th precinct are admissible knowingly and voluntarily made following the Defendant being administered his Miranda rights.
Evidence of the Defendant's refusal to submit to the breathalyzer test is not admissible at trial.
The foregoing constitutes the opinion, decision, and order of the Court.
Dated: July 19, 2024
Queens, New York
ENTER
Vidya Pappachan, J.C.C